PER CURIAM.
In this matter, we undo a series of egregious wrongs perpetrated upon the appellants, all of which were compounded by the assertion of frivolous defenses of numerous and patently erroneous trial court orders.
Dr. Roberta Santini appeals an order enforcing a charging lien filed by her former attorney, Bartley C. Miller. She asserts that Miller forfeited his rights to compensation pursuant to a contingency fee agreement because he withdrew his representation prior to the occurrence of the contingency. We agree that the trial court erred in permitting Miller to enforce his charging lien, reverse the order and remand for the trial court to vacate the charging lien. We also reverse the trial court’s awards of sanctions against both Donald R. McCoy, Dr. Santini’s attorney in the charging lien matter, and Dr. Santi-ni personally. Finally, we also find that this is one of those “rare circumstances” in which it is appropriate to impose sanctions against an appellee and we therefore sua sponte award appellate attorney’s fees to the appellants.
FACTUAL AND PROCEDURAL BACKGROUND
In 1996, while Dr. Santini was a radiologist at the Cleveland Clinic Florida (the “Clinic”), Dr. Santini hired attorney Miller to represent her in an employment discrimination and sexual harassment action against the Clinic. At the time Dr. Santini retained Miller, he was a managing partner at the law firm of Panza, Maurer, Maynard and Neel, P.A. (“Panza firm”). Dr. Santini signed a contingency fee agreement (the “Panza Firm Employment Contract”) in which she retained the Panza firm to represent her. The employment contract provided for compensation “contingent upon recovery,” and specified the percentages of any recovery to be paid as fees. Additionally, the contract provided that the “client will not be responsible for any costs or attorney fees in this matter should the client not prevail.”
Throughout the course of Miller’s representation in the underlying matter, he twice moved to different law firms yet Dr. Santini decided to continue with the representation provided by Miller each time. For whatever reason, however, Miller and Dr. Santini did not execute any new written contingency fee agreements even though Miller uninterruptedly continued his representation. Since July 1, 1999, Miller worked for his own practice, Bartley C. Miller & Associates.
In 1997, Miller, on behalf of Dr. Santini, filed a charge with the Equal Employment Opportunity Commission (“EEOC”) and with the Broward County Human Rights Division against the Clinic for gender and age discrimination. Dr. Santini received a “Right to Sue Notice” from the EEOC on or before February 2, 1998. Thereafter, on May 29,1998, Miller filed a complaint in federal district court on behalf of Dr. San-tini. The federal district court granted summary judgment for the Clinic finding Dr. Santini’s claims to be time-barred because she had failed to file them within ninety days of receipt of notice from the EEOC.
The federal court also issued an order imposing sanctions upon Miller for attempting to conceal the date upon which *26 Dr. Santini received the original notice from the EEOC.[1] The sanctions award required Miller to pay the Clinic approximately $20,000 in excess attorney’s fees.
Miller then filed the instant action in state court, asserting the same claims under the Florida Civil Rights Act as had been filed and dismissed in federal court.[2]
Because of Miller’s conduct in the federal case, the Florida Supreme Court suspended him from the practice of law for one year. See Fla. Bar v. Miller, 863 So.2d 231, 235 (Fla.2003). Although the suspension was scheduled to begin in October 2003, Dr. Santini signed an affidavit authored by Miller, requesting that his suspension be postponed because her trial date was near. The Florida Supreme Court delayed Miller’s suspension until November 2003. The trial, however, was postponed for an additional year. Because of his suspension by the Florida Supreme Court, Miller withdrew from further representation of Dr. Santini in November 2003. Indicating that he no longer desired to practice law, Miller did not seek Florida Bar reinstatement either after serving his one-year suspension, or prior to filing a charging lien in this case.
Prior to his suspension, Miller arranged for Justin M. Senior to represent Dr. San-tini during Miller’s suspension. Senior had worked on Dr. Santini’s appeal and had, under Miller’s supervision, worked on Dr. Santini’s case when both were employed by the Panza firm. A few months before his one-year suspension was scheduled to begin, Miller signed a fee sharing agreement with Senior which specifically referred to a “contingency fee contract between Dr. Santini and Miller.”[3]
Senior represented Dr. Santini at a three-week jury trial beginning in November 2004. No verdict was reached and the case was scheduled for retrial in October 2005. On the eve of the retrial, Senior negotiated a $500,000 settlement with the Clinic’s attorneys.
In December 2005, Senior sent Dr. San-tini “a new release with the Clinic’s changes.” It specified that from the $500,000 settlement proceeds, the Clinic would provide a check in the amount of $250,000 “made payable to the Law Offices of Justin M. Senior, P.A. Trust Account, for Santini’s attorneys’ fees and costs.” Dr. Santini, however, refused to sign the agreement claiming that she had not agreed to the provision setting the amount of the attorney’s fees. Dr. Santini was willing to sign an agreement for the $500,000 settlement and indicated the division (between her portion and any and all lawyer’s fees and costs) would be “more or less” fifty-fifty. She was unwilling, however, to commit because she thought the details of the attorney’s fees were still being discussed.
Dr. Santini requested from Senior a reduction in Miller’s portion of the fees be *27 cause of the delays in the case which could have been avoided if Miller had timely filed the federal case. Because Miller and Senior refused to adjust their demand for half the settlement, Dr. Santini sought the second opinion of another attorney, Donald R. McCoy, who is also an appellant in this appeal.

Miller’s Motion to Enforce His Charging Lien and the Trial Court’s Resultant Final Judgment

In December 2005, Miller demanded that Dr. Santini pay him $157,650 as his share of the $250,000 contingency fee. McCoy immediately asked for copies of the fee agreement, cost and expense invoices, and any other records on which Miller based his claims. Instead of providing these documents, Miller filed an attorney’s charging lien on March 10, 2006.
In December 2006, Miller sent Dr. San-tini several invoices claiming that she owed him $360,773.92 (a year earlier he had sought only $157,650). These invoices included attorney’s fees of $313,982.50 based on an hourly rate of $325 per hour and costs totaling $46,791.42.
On March 13, 2007, Miller filed a motion to enforce his charging lien. The motion provided that “[although [Miller] requested that she do so, [Dr. Santini] never executed a written contingency fee agreement. The parties at all times understood, however, that [Miller] was to be paid a reasonable fee for his services.” Dr. San-tini filed a memorandum in opposition to this motion on April 24, 2007, in which Dr. Santini contended that she had signed a written contingency fee agreement with the Panza firm when Miller was a managing partner there and that “[a]t all times during the representation” both parties understood that Miller was representing Dr. Santini under a contingency fee agreement.[4]
During the first hearing on Miller’s motion to enforce his charging lien, and before taking evidence, the trial court ruled that Miller could recover in quantum me-ruit because his contingency fee agreement with Dr. Santini was not in writing, as required, and because Miller did not voluntarily withdraw but was forced to do so when he was suspended for unethical conduct.
At the conclusion of the testimony the trial court found that Miller should be awarded fees of $255,000 based upon an hourly rate of $300 — instead of $325 which he claimed — and a reduced number of hours. With the agreed expenses of $43,000, the court awarded Miller $298,000. Over Dr. Santini’s objection, the court then added $72,180.36 to the award as prejudgment interest, calculated from October 15, 2005.
Final judgment was entered for a total award of fees and costs in the amount of $370,180.36 of which the $43,000 awarded as costs has been paid.

Sua Sponte Sanctions Against McCoy

In his first memorandum opposing Miller’s motion to enforce the charging lien, McCoy, on behalf of Dr. Santini, claimed that the negotiated settlement with the Clinic was never finalized because of the fee dispute. At the first and in subsequent hearings, the question was raised as to the finality of the settlement. Miller’s counsel assured the court the settlement was final whether or not Dr. Santini signed it. Each time the issue was raised, McCoy stated that Dr. Santini did not agree that the settlement was finalized.
The trial court raised the issue again at a hearing on September 24, 2007. After *28 conferring with Dr. Santini, McCoy negotiated an agreement with the Clinic’s attorney the following day for a final settlement agreement under which the $500,000 proceeds would be placed in an escrow account, subject to a consideration, decision and ultimate order of the court. The provision for payment of $250,000 directly to Senior for attorney’s fees and costs (originally suggested by Senior in December 2005) was to be deleted from the final agreement; the parties would execute mutual releases and Dr. Santini would stipulate to the dismissal of the case against the Clinic. These terms were recited on the record and approved by the trial court on September 26, 2007.
Miller’s counsel then made an ore terms motion to sanction McCoy for several alleged “misrepresentations” including McCoy’s statements that the settlement agreement was never finalized prior to the stipulation entered into with the Clinic’s attorney that day. Miller’s counsel further moved to strike Dr. Santini’s pleadings, moved for an order to pay Miller’s fees and costs, and moved for the court to refer McCoy to The Florida Bar.
McCoy argued that Miller’s counsel was asking the trial court to sanction McCoy “mid-stream in this proceeding without any regard” for the twenty-one day “safe harbor” provision found in section 57.105(4), Florida Statutes. Miller’s counsel contended that the trial court should instead impose sanctions under its “inherent power.” The trial court ruled that it would impose the requested sanctions sua sponte under both section 57.105 and its inherent authority.[5] Therefore, the trial judge reasoned, the twenty-one day notice period was unnecessary.
McCoy moved for reconsideration and submitted the affidavit of Kevin P. Tynan, an attorney who has expertise regarding the Rules Regulating The Florida Bar — in particular, the Rules of Professional Conduct — and experience as branch staff counsel of the Fort Lauderdale office of The Florida Bar. Tynan reviewed the pertinent trial transcripts and other documents, as well as the applicable Bar rules and legal precedent and concluded, “It is my expert opinion that based upon all of the foregoing that McCoy’s assertion that the settlement was not final was made in good faith, in reliance to known facts that do not appear to be controverted, and with the belief that precedent supported this claim.”
Inexplicably, the trial court rejected McCoy’s request for an evidentiary hearing on the issue. On January 29, 2009, the trial court entered an order determining the amount of sanctions and awarding $5,172.40 in costs and $5,665.00 in fees against McCoy.

Miller’s Motion for Attorney’s Fees and Costs To Enforce His Charging Lien

In November 2008, the trial court granted Miller’s motion for leave to untimely file a 173-page motion seeking to recover his attorney’s fees and costs incurred in prosecuting his motion to enforce the charging lien. The motion asked the trial court to sanction Dr. Santini and her counsel “sua sponte” under section 57.105, Florida Statutes, and under its “inherent power” over the conduct of litigants.
McCoy filed a memorandum in opposition. At the hearing on Miller’s motion for sanctions, McCoy requested an evidentiary hearing regarding his litigation conduct and that of his client before any sanctions *29 were imposed. The trial court, however, summarily granted Miller’s motion.[6]
The trial court then heard argument regarding Miller’s motion for an award of all of the fees and costs he expended enforcing his charging lien. Citing case law, McCoy specifically asked for an evidentia-ry hearing regarding the broad allegations of misconduct alleged in Miller’s motion. The trial court made no findings or conclusions on the record other than uttering the words “res ipsa loquitur” and directed Miller’s counsel to submit an order and to “pass it past Mr. McCoy ... if he objects, we’ll have a hearing.”[7]
In April 2009, Miller’s counsel submitted an eighteen-page proposed order to the trial court, without first showing it to McCoy. Miller’s counsel sent the order to McCoy at the same time that she submitted it to the trial court. McCoy filed objections to entry of this order and moved to allow thirty days to respond. McCoy objected on the grounds that the trial court had not directed the parties to submit findings and conclusions, and on the grounds that Miller had violated both local rules and the trial court’s directions by submitting the proposed orders without first showing them to opposing counsel.
Incredibly, the lower court nonetheless signed the proposed order without change, without any hearing, and without ruling on Dr. Santini’s objections. The trial court denied Dr. Santini’s timely filed motion for rehearing and a timely notice of appeal was filed.
DISCUSSION

Miller’s Forfeiture of His Right to Compensation from Dr. Santini

“We review trial court orders on attorney’s fees for an abuse of discretion. We have de novo review however of the trial court’s interpretation of law.” Robin Roshkind, P.A. v. Machiela, 45 So.3d 480, 481 (Fla. 4th DCA 2010) (citations omitted).
The Florida Supreme Court has established several rules of law regarding an attorney’s entitlement to recover fees under a contingency fee agreement where the attorney either withdraws or is discharged prior to the contingency occurring. In Rosenberg v. Levin, 409 So.2d 1016 (Fla.1982), the Florida Supreme Court addressed the situation where a client discharges the attorney without cause under a contingency fee agreement and held “that an attorney employed under a valid contract who is discharged without cause before the contingency has occurred or before the client’s matters have concluded can recover only the reasonable value of his services rendered prior to discharge, limited by the maximum contract fee.” Id. at 1021. In explaining its reason for limiting recovery to the maximum contract fee, the Florida Supreme Court wrote that it would be “unacceptable” for an attorney “to receive a fee greater than he bargained for under the terms of his contract.” Id.
*30 Whereas Rosenberg addressed situations involving lawyer/client contractual relationships where the attorney is discharged without cause, this court has weighed in on matters where an attorney is discharged for cause. In Searcy, Denney, Scarola, Barnhart & Shipley, P.A. v. Scheller, 629 So.2d 947, 954 (Fla. 4th DCA 1993), we held that when an attorney has a written contingency fee agreement and is discharged for cause, the lawyer’s fees should be based on the modified quantum meruit fee as articulated in Rosenberg reduced by the amount of the damages suffered by the client as a result of the lawyer’s conduct that led to the discharge. Id.
In Faro v. Romani, 641 So.2d 69 (Fla. 1994), the Florida Supreme Court addressed the situation where an attorney voluntarily withdraws from representing a client — before the contingency occurred— but where the withdrawal was necessitated by questionable client conduct. The supreme court held:
[W]hen an attorney withdraws from representation upon his own volition, and the contingency has not occurred, the attorney forfeits all rights to compensation .... We further hold, however, that if the client’s conduct makes the attorney’s continued performance of the contract either legally impossible or would cause the attorney to violate an ethical rule of the Rules Regulating The Florida Bar, that attorney may be entitled to a fee when the contingency of an award occurs.
Id. at 71 (emphasis added). Subsequent cases have steadfastly emphasized that the withdrawing attorney forfeits all rights to compensation unless the attorney can show that the client’s conduct made the withdrawal necessary. See, e.g., DePena v. Cruz, 884 So.2d 1062, 1063-64 (Fla. 2d DCA 2004); Carbonic Consultants, Inc. v. Herzfeld & Rubin, Inc., 699 So.2d 321, 324 (Fla. 3d DCA 1997); Kocha & Jones, P.A. v. Greenwald, 660 So.2d 1074, 1075 (Fla. 4th DCA 1995).
We also find cases from other jurisdictions persuasive in holding that withdrawing from a case because of a bar suspension constitutes withdrawing on one’s own volition. See, e.g., Royden v. Ardoin, 160 Tex. 338, 331 S.W.2d 206, 209 (1960) (“His disbarment or suspension is considered tantamount to and to have the same effect as a voluntary abandonment, for the attorney by knowingly and willfully practicing such a course of conduct that would lead to the termination of his right to practice, renders it impossible to complete the work that he engaged to perform.”).
Almost defiantly, Miller claims that Faro does not apply here because the contingency fee agreement he originally entered into with Dr. Santini violated the Rules Regulating The Florida Bar because a new written contingency fee agreement was not executed following any of the multiple times when Miller moved from one firm to the next.[8] In essence, Miller incredulously claims that Florida law requires that he be permitted to recover more from his former client by violating the rules governing contingency fees than *31 he would be entitled to if he had followed them.
To support this outrageously brazen contention, Miller points to a single sentence in Chandris, S.A. v. Yanakakis, 668 So.2d 180 (Fla.1995), where the Florida Supreme Court wrote, “Florida contingent fee agreements entered into by attorneys subject to our regulations but which do not comply with the regulations are likewise void as against the public interest.” Id. at 181. He argues that the contingency fee agreement here violates the Rules Regulating The Florida Bar because as a result of his exit from the Panza firm and his subsequent reported failures to propose new written contingency fee agreements, his representation of Dr. Santini became grounded on an “oral agreement” and thus void.[9]
Not surprisingly, Chandris does not support Miller’s argument.[10] To the contrary, later in the Chandris opinion where the supreme court addressed the issue of contingency fee agreements that do not adhere to the rules, the court explicitly avoided repeating language that such contracts are void (this is in contrast to its detailed analysis of agreements entered into by non-members of The Florida Bar which it again reiterated were void contracts). In particular, the supreme court wrote:
Likewise, we hold that a contingent fee contract entered into by a member of The Florida Bar must comply with the rule governing contingent fees in order to be enforceable. We have determined that the requirements for contingent fee contracts are necessary to protect the public interest. Thus, a contract that fails to adhere to these requirements is against public policy and is not enforceable by the member of The Florida Bar who has violated the rule. Moreover, enforcing contingent fee agreements that are not in compliance with the rule would be unfair as well as constitute a competitive disadvantage to members of The Florida Bar who do comply with the rule.
Chandris, 668 So.2d at 185-86 (emphasis added) (footnote omitted). Also, in the opinion, the Florida Supreme Court qualified its overruling of previous cases which had found “contingent fee agreements to be enforceable despite some violation of the Rules Regulating The Florida Bar.” Id. at 185. The court expressly disapproved of those cases only “to the extent they may be read to hold that a contingent fee contract which does not comply with ... the Rules Regulating The Florida Bar is enforceable by an attorney who claims fees based upon a noncomplying agreement.” Id. (emphasis added). Here, it is the client and not the attorney who seeks to enforce the contingency fee agreement.
Accepting Miller’s selective reading of Chandris would harm the public and put *32 attorneys who comply with the rules at a competitive disadvantage. See id. at 186. Under such an interpretation, an attorney who entered into an oral contingency fee agreement with a client would be entitled to recover in quantum meruit even if the client did not prevail in the underlying case. Such a result would be absurd and simply unacceptable.[11] Likewise, it is “unacceptable” to us to allow Miller to impose a charging lien based on a quantum meruit determination far in excess of what he bargained for with Dr. Santini. See Rosenberg, 409 So.2d at 1021 (holding that “for the attorney to receive a fee greater than he bargained for under the terms of his contract ... [is] unacceptable”).
Thus, we hold that the rules of Rosenberg, Scheller, and Faro still protect a client even where the contingency fee agreement between the client and attorney does not conform to the Rules Regulating The Florida Bar. An attorney who violates the rules of professional conduct by entering into a non-conforming agreement will not be able to collect more fees based merely on the non-conformance.
Applying the Faro rule and subsequent case law to the present case, Miller forfeited all of his rights to receive compensation from Dr. Santini because Miller had agreed to represent Dr. Santini on a contingency fee basis, Miller withdrew before the contingency occurred, and Miller’s withdrawal was not made necessary by Dr. Santini’s conduct. Accordingly, the trial court erred in granting Miller’s motion to enforce his charging lien.[12]

Other Glaring Errors with Respect to the Charging Lien Final Judgment

We do not take any joy in documenting the lower court’s numerous errors. But because we have reluctantly exercised our authority to sua sponte impose fees against the appellee, Miller, the glaring errors of the trial court become necessarily noteworthy. The trial court clearly, fundamentally and unquestionably erred (1) in its application of existing law in calculating quantum meruit fees; (2) in its calculation of prejudgment interest; and (3) in not limiting the final judgment to the proceeds of the settlement in this case.[13]

*33
Erroneous Quantum Meruit Calculations

In Searcy, Denney, Scarola, Barn-hart & Shipley, P.A. v. Poletz, 652 So.2d B66 (Fla.1995), the Florida Supreme Court addressed “the proper criteria for determining the quantum meruit recovery of an attorney discharged without cause prior to resolution of the client’s case.” Id. at 367.[14] The conventional loadstar approach requires the trial court to compute the number of hours reasonably spent in providing the services and a reasonable hourly rate. Id. In Poletz, however, the supreme court explained:
The conventional lodestar approach is ill-suited for the task of assessing attorney’s fees due as damages for breach of an agreement for the payment of fees because it does not allow for consideration of “the totality of the circumstances surrounding the professional relationship.” Unlike an award of attorney’s fees to a prevailing party, a quantum meruit award must take into account the actual value of the services to the client. Thus, while the time reasonably devoted to the representation and a reasonable hourly rate are factors to be considered in determining a proper quantum meruit award, the court must consider all relevant factors surrounding the professional relationship to ensure that the award is fair to both the attorney and client.
Id. at 368-69 (emphasis added) (internal citation omitted). The supreme court then specifically listed “the fee agreement itself, the reason the attorney was discharged, [and] actions taken by the attorney or ehent before or after discharge” as examples of factors a court should consider. Id. at 369.
The holding in Poletz applies equally here: “the trial court erred as a matter of law by failing to consider the totality of the circumstances present in this case, instead considering only the time reasonably expended and the reasonable hourly rate for the services.” Id. Furthermore, the trial court acknowledged that the amount awarded to Miller might be unfair to Dr. Santini considering the amount of total recovery. Poletz, however, requires that a quantum meruit award must be “fair to both the attorney and client.” Id. (emphasis added). In this case, it would not — under anyone’s good faith analysis — be fair to the client to allow Dr. Santini’s attorneys to recover more than 50% of the settlement in light of their continued assurances that, under no circumstances, would their fees and costs ever exceed 50% of any recovery.
When determining the actual value of Miller’s services, the trial court refused to hear evidence regarding the harm Dr. Santini suffered as a result of the dismissal of her federal claim. Miller clearly breached his duty to Dr. Santini in failing to timely file the federal case yet the trial court found that Dr. Santini suffered no harm because she was ultimately able to settle with the Clinic. The trial court also erred in refusing to value the benefit that Miller received in having the Clinic waive its right to excess attorney’s fees that the federal trial court found Miller, through his own misconduct, caused the Clinic to incur.

Erroneous Prejudgment Interest Calculations

Although there will be no basis to award prejudgment interest on remand because, *34 as set forth above, Miller forfeited all his rights to receive compensation from Dr. Santini, the trial court’s contradictory calculation of prejudgment interest, and Miller’s failure to concede this error, further illustrate our finding that Miller has proceeded with this appeal in blatant bad faith.
“A trial court’s decision concerning a litigant’s entitlement to prejudgment interest is reviewed de novo.” McCarthy v. Estate of Krohn, 16 So.3d 193, 195 (Fla. 4th DCA 2009). Where an attorney obtains a judgment against a client for services rendered, the attorney is entitled to prejudgment interest on the award even if the recovery is based on quantum meruit. See id. In such a case, “interest accrues from the date the entitlement to attorney fees is fixed through agreement, arbitration award, or court determination.” Quality Engineered Installation, Inc. v. Higley S. Inc., 670 So.2d 929, 930-31 (Fla. 1996).
Notwithstanding that the trial court found that the contingency fee agreement between Dr. Santini and Miller was ineffectual, the trial court calculated prejudgment interest from October 15, 2005 — the date on which Dr. Santini and the Clinic agreed to settle the case for $500,000. We find this inconsistency puzzling. If the trial court believed that it was bound to exclude all consideration of the contingency fee agreement, then the October 15, 2005 date would be an arbitrary date and not the date that Miller’s entitlement to fees was fixed through agreement.[15] If such were the case, the earliest possible date upon which Miller’s fees could be due was the date in which Miller first sent invoices to Dr. Santini — sometime in December 2006. See McLaughlin, Inc. v. Ric-Man Int’l, Inc., 31 So.3d 308, 309 (Fla. 4th DCA 2010).

Erroneous Limitation of Final Judgment Amount

“By definition, an attorney’s charging lien cannot attach to property not involved in the suit and not before the court.” Cole v. Kehoe, 710 So.2d 705, 706 (Fla. 4th DCA 1998); see also Correa v. Christensen, 780 So.2d 220, 220 (Fla. 5th DCA 2001) (“It is not enough to support the imposition of a charging lien that an attorney has provided his services; the services must, in addition, produce a positive judgment or settlement for the client, since the lien will attach only to the tangible fruits of the services.”).
To circumvent this well-established rule, Miller argues that the trial court was not required to limit the final judgment in this case to the escrowed settlement funds because this was a “proceeding in quantum meruit and not based upon a charging lien.” But for the fact that the trial court apparently agreed, this argument would not merit further discussion. On March 13, 2007, Miller filed a verified motion to enforce his charging lien with the trial court handling the original action between Dr. Santini and the Clinic.[16] Thus, it es *35 capes us how Miller could now contend in his answer brief that this action was “not based upon a charging lien.”
As the underlying action in this case was a motion to enforce a charging lien, the trial court erred in not limiting its final judgment on Miller’s motion to the es-crowed settlement funds. See, e.g., Rudd v. Rudd, 960 So.2d 885, 887-88 (Fla. 4th DCA 2007) (“On remand, the language of the charging lien order should be amended to reflect that it is limited in scope to the property before the court by virtue of the [underlying] action.” (citing Cole, 710 So.2d at 706)).

Impermissible Sanctions Against McCoy

This court will only reverse a trial court’s decision to impose sanctions if the trial court has abused its discretion. See Boca Burger, Inc. v. Forum, 912 So.2d 561, 573 (Fla.2005). “If reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion.” Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980).
Here, the trial court clearly abused its discretion in imposing sanctions. First, it was unreasonable for the trial court to find that there was not a good faith factual and legal basis for McCoy’s claim that the settlement agreement was not final under Florida law at the time he raised the issue. The agreement specifically gave Dr. Santini twenty-one days to consult with an attorney before signing/executing and then another seven days, after signing, to revoke before the agreement would become enforceable. Thus, as a matter of contract interpretation, the agreement was not binding on Dr. Santini until seven days after she signed it. Otherwise, the right to consult with an attorney would have no effect. See Barone v. Rogers, 930 So.2d 761, 763-64 (Fla. 4th DCA 2006) (“As settlement agreements are contractual in nature, they are interpreted and governed by contract law.”); Herian v. Se. Bank, N.A., 564 So.2d 213, 214 (Fla. 4th DCA 1990) (“An interpretation of a contract which gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect.”). Dr. Santini was dissatisfied with the language which paid 50% of the settlement proceeds directly to Senior for attorney’s fees. Therefore, before signing the agreement she consulted with another attorney and upon doing so elected not to execute the agreement under its existing terms.
The trial court, however, found that the agreement became enforceable as an oral settlement agreement the day Senior agreed with the Clinic on the total amount ($500,000) and non-disclosure terms. The trial court determined that as long as all of the material issues between Dr. Santini and the Clinic were resolved, then the oral settlement was enforceable. In Cheverie v. Geisser, 783 So.2d 1115 (Fla. 4th DCA 2001), however, we reversed a trial court’s finding that the parties had reached a binding settlement agreement even though they had agreed to the total amount of payment. Id. at 1118. Although slightly different from the present case, the facts in Cheverie are similar enough for McCoy to at least make a good faith defense that the settlement agreement was not final.
In particular, in Cheverie, we held that for a settlement agreement to be enforceable, it “must be sufficiently specific and *36 mutually agreeable as to every essential element.” Id. (emphasis added) (citation and internal quotation marks omitted). While the trial court could make a finding that Dr. Santini’s concern that half of the proceeds were paid directly to Senior rather than to an escrow account was not an “essential element,”[17] McCoy’s argument that this was an essential element was certainly not frivolous, especially considering that Dr. Santini had contacted him because of her dissatisfaction over this specific clause.
Thus, because McCoy had a good faith factual and legal basis for his claim, the trial court abused its discretion in sanctioning him for making this argument.
Additionally, the trial court made several due process errors with regard to sanctioning McCoy based on section 57.105, Florida Statutes (2007). The most critical were not making express findings of bad faith and never holding a full evidentiary hearing regarding the paramount issue of good faith. See Ferdie v. Isaacson, 8 So.3d 1246 (Fla. 4th DCA 2009). In Ferdie, we stated:
When a trial court imposes liability against counsel for a fee award entered under section 57.105, it “must make [1] an express finding that the claim was frivolous and, ... [2] an express finding that the attorney was not acting in good faith based upon the representations of his client.”
Id. at 1250 (citations omitted). We further articulated that “[a] trial court’s decision under section 57.105(1) must be supported by competent substantial evidence; therefore, it follows that a full evidentiary hearing on the good faith issue is necessary.” Id. We then defined a “full hearing” as “one during which the party was represented by counsel, examined witnesses, and had the opportunity to offer evidence.” Id. (citation and internal quotation marks omitted).
Here, the trial court summarily imposed liability against McCoy and never made any express findings with regard to the good faith exception. Furthermore, no full evidentiary hearing on good faith ever occurred. In fact, the trial court explicitly denied McCoy’s written motion for reconsideration of the sanctions in which McCoy specifically requested an evidentiary hearing.[18]
The trial court also erred when it awarded costs against McCoy under the section 57.105 motion which is not permitted by the statute. Ferdie, 8 So.3d at 1251 (“Section 57.105 ... provides that ‘the court shall award a reasonable attorney’s fee to be paid to the prevailing party,’ but makes no mention of costs.”).
Although the trial court’s failure to make any findings regarding bad faith is sufficient to reverse the judgment, McCoy also argues that the trial court’s sanction should be prohibited under section 57.105 because this was actually based on a motion by Miller, and Miller did not comply with the “safe harbor” provisions *37 of the statute. See § 57.105(4), Fla. Stat. (2007). Miller’s counsel made an ore terms motion to the trial court -without ever having served McCoy with the motion. McCoy argued that the motion should be denied because Miller had not given the twenty-one-day notice as required by the statute. Not deterred by the plain reading of the statute, Miller’s counsel then asked the court to punish McCoy under its own “inherent power” to sanction litigants. The trial court — apparently also undeterred — ruled that it was imposing sanctions sua sponte under both section 57.105 and under its inherent authority.
The Third District has held that a trial court cannot simply adopt a party’s motion as its own in order to circumvent the safe harbor:
We conclude that this procedure is contrary to the intent of the statute. The legislative intent is to require the twenty-one-day notice whenever a subsection 57.105(5) motion is filed by a party. It would frustrate the legislative intent to avoid the twenty-one-day notice by allowing the court to adopt the party-filed motion as the court’s own. Since this was a party-filed motion, the subsection 57.105(4) notice period had to be observed.
Davidson v. Ramirez, 970 So.2d 855, 856 (Fla. 3d DCA 2007). Although the Second District recently declined to follow Davidson mostly because of factual distinctions, the Second District also noted: “Accepting Davidson’s reasoning at face value would mean that the trial court loses the ability to impose sanctions even when clearly warranted if a party files a section 57.105 motion for sanctions that fails to comply with the twenty-one-day notice requirement imposed on parties.” Koch v. Koch, 47 So.3d 320, 324 (Fla. 2d DCA 2010). The First District has held that courts can adopt a party’s motion for sanctions as its own under section 57.105 where procedural rules prevent the moving party from giving twenty-one days’ notice. See Unifirst Corp. v. City of Jacksonville, 42 So.3d 247 (Fla. 1st DCA 2009). Such is not the case here.
To the contrary, here, Miller had ample time to give Dr. Santini and McCoy twenty-one days’ notice if he believed Dr. Santi-ni’s claim (that the settlement agreement was not final) was frivolous. The record shows that the trial court only chose to sanction McCoy on its “own initiative” after Miller’s counsel made an ore tenus 57.105 motion, and McCoy objected for not having received the requisite twenty-one day notice under the statute. The trial court seemed to have adopted the motion only to circumvent the safe harbor. This will not stand and the sanctions shall be vacated.
The trial court also indicated that it was sanctioning McCoy under its inherent authority. In Moakley v. Smallwood, 826 So.2d 221, 226 (Fla.2002), the Florida Supreme Court recognized that “a trial court possesses the inherent authority to impose attorneys’ fees against an attorney for bad faith conduct.” But the supreme court warned,
In exercising this inherent authority, an appropriate balance must be struck between condemning as unprofessional or unethical litigation tactics undertaken solely for bad faith purposes, while ensuring that attorneys will not be deterred from pursuing lawful claims, issues, or defenses on behalf of their clients or from their obligation as an advocate to zealously assert the clients’ interests. The inherent authority of the trial court, like the power of contempt, carries with it the obligation of restrained use and due process.
Id. at 226-27 (emphasis added). The Florida Supreme Court then clearly laid out *38 the following principles which must be followed before such sanctions will be upheld:
1. Sanctions “must be based upon an express finding of bad faith conduct.” Id. at 227 (emphasis added).
2. Sanctions “must be supported by detailed factual findings describing the specific acts of bad faith conduct that resulted in the unnecessary in-currence of attorneys’ fees. Thus, a finding of bad faith conduct must be predicated on a high degree of specificity in the factual findings.” Id. (emphasis added).
3. “[T]he amount of the award of attorneys’ fees must be directly related to the attorneys’ fees and costs that the opposing party has incurred as a result of the specific bad faith conduct of the attorney.” Id.
4. The attorney being sanctioned must be given “notice and an opportunity to be heard — including the opportunity to present witnesses and other evidence.” Id.
5. “If a specific statute or rule applies, the trial court should rely on the applicable rule or statute rather than on inherent authority.” Id. (emphasis added).
Here the trial court failed to follow at least four out of five of these principles. The trial court made no findings of bad faith (in violation of the first two principles). Also, the trial court denied McCoy’s request for a hearing and the opportunity to be heard. Finally, the trial court wrote that it was sanctioning McCoy because it found that his allegation that the settlement offer was not final until Dr. Santini signed it “had no basis in fact or in law— none at all.” Section 57.105(l)(b) would apply as a vehicle to sanction McCoy if such were true. Thus, the trial court violated principle five that it should rely on the statute rather than its inherent authority.

Miller’s Award of Attorney’s Fees and Costs Incurred Enforcing His Charging Lien

Here, Miller filed a motion for sanctions under section 57.105 more than thirty days after the trial court had already entered its final judgment. McCoy again argued that Miller had failed to comply with the twenty-one-day notice requirement. Again, the trial court elected to grant the motion which did not comply with the safe harbor provisions, by adopting the motion as a sanction “on its own initiative.”
Even if we were to agree with the Second District that there should be no blanket rule preventing a court from adopting a party’s untimely filed motion, under the facts here, the trial court clearly circumvented the statutory intent of the twenty-one-day notice. Here, the trial court never held a meaningful hearing regarding Miller’s 173-page motion. Instead, the trial court simply granted the motion and then permitted Miller’s counsel to write the order. The “court’s” order is almost verbatim from Miller’s motion. Under these facts, it seems unlikely that the trial court’s sanctions were on its own initiative.
The final order which Miller’s counsel wrote for the trial court states that it would “have been impossible” for Miller to give twenty-one days’ notice because “the defense kept shifting theories and adding additional baseless contentions.” In the same order, the trial court “found” that all of Dr. Santini’s defenses were baseless. These findings, however, are not in any way supported by competent and substantial evidence. If all of Dr. Santini’s defenses were baseless, Miller could have filed a section 57.105 motion at the beginning of the proceedings demanding that Dr. Santini withdraw her objections. Thus, under these circumstances, the fail *39 ure to provide the twenty-one-day safe harbor requires that this order be reversed.
Furthermore, the trial court abused its discretion in that it was required to permit Dr. Santini and McCoy an evidentiary hearing with respect to a finding of bad faith — whether the sanctions were issued under the trial court’s inherent authority or on its own initiative under section 57.105. See Moakley, 826 So.2d at 227; Ferdie, 8 So.3d at 1250. Nor did the trial court base its finding of bad faith conduct on “a high degree of specificity in the factual findings.”[19] See Moakley, 826 So.2d at 227.
In what is perhaps the most egregious of all the trial court’s errors in this case, the trial court signed an eighteen-page order submitted by Miller’s counsel granting Miller’s motion for attorney’s fees and costs without first giving McCoy an opportunity to review the order. “A court should never direct only one side to prepare an order without assuring that the opposing party has had the opportunity to comment or object to its contents, or prepare its own submission.” Ross v. Bo-tha, 867 So.2d 567, 572 (Fla. 4th DCA 2004). In Ross, we also noted, “It is also difficult to believe, on such fact-intensive issues as presented here, that an attorney can be so omniscient as to the court’s findings that they could be entirely correct without a single edit where the court made no rulings in open court.” Id. The Florida Supreme Court, in approving Ross, wrote:
When the trial judge accepts verbatim a proposed final judgment submitted by one party without an opportunity for comments or objections by the other party, there is an appearance that the trial judge did not exercise his or her independent judgment in the case. This is especially true when the judge has made no findings or conclusions on the record that would form the basis for the party’s proposed final judgment. This type of proceeding is fair to neither the parties involved in a particular case nor our judicial system.
Perlow v. Berg-Perlow, 875 So.2d 383, 390 (Fla.2004) (footnote omitted). The supreme court then held that “[w]hile a trial judge may request a proposed final judgment from either or both parties, the opposing party must be given an opportunity to comment or object prior to entry of an order by the court.” Id. (emphasis added).
The order here was eighteen pages and the trial court accepted it with almost no changes. Miller’s counsel submitted the order to the trial court on the same day she submitted it to Dr. Santini’s counsel. Immediately upon receiving the proposed order, McCoy filed a motion objecting to *40 entry of the proposed order and requesting thirty days to respond and prepare an alternate proposed order. The trial court entered the unedited order without ruling on Dr. Santini’s motion. Dr. Santini then filed a motion for rehearing, which the trial court denied as well. On this basis alone, we could reverse the order as the trial court abused its discretion by not exercising independent judgment.
Clearly, the trial court lacked competent substantial evidence to support a finding that Dr. Santini and her counsel litigated in bad faith as the trial court never held any evidentiary hearings on bad faith. See Ferdie, 8 So.3d at 1250 (“A trial court’s decision under section 57.105(1) must be supported by competent substantial evidence; therefore, it follows that a full evi-dentiary hearing on the good faith issue is necessary.”).
The trial court also erred in finding that Dr. Santini and McCoy advanced baseless arguments. In its order granting Miller’s motion for attorney’s fees and costs, the trial court wrote (or at least approved Miller’s counsel’s written order stating): “[Dr. Santini] had no legitimate defenses, no legitimate legal theories on which to support any defense, and no legitimate material facts, disputed or otherwise, on which to base any defense.” This is plainly contradicted by the trial court’s own final ruling on costs and fees where Miller’s initial claims were reduced by $62,000. Furthermore, as we have previously explained, most of Dr. Santini’s defenses were substantially meritorious.
AWARD OF APPELLATE ATTORNEY’S FEES TO APPELLANTS
Despite being given multiple opportunities to ethically concede error including a spirited oral argument session scheduled by this court on its own motion, Miller has callously proceeded in blatant bad faith.
As such, we have determined that this is one of those “rare circumstances” in which we should impose sanctions against an ap-pellee and sua sponte award appellate attorney’s fees to the appellants in this case. See Boca Burger, Inc. v. Forum, 912 So.2d 561, 570 (Fla.2005).
In Boca Burger, the Florida Supreme Court held that “an appellate court may, in appropriate circumstances, impose sanctions on an appellee or its lawyer for its frivolous defense of a patently erroneous trial court order.” Id. at 563. The supreme court warned that although an ap-pellee may be defending an order of a trial court, “an appellee cannot hide behind the ‘presumption of correctness’ of an order that the appellee itself procured by misrepresenting the law or the facts. The presumption of correctness is necessarily based on another presumption: that the appellee correctly informed the trial court of the facts and applicable law.” Id. at 571. In explaining that appellate counsel must sometimes concede error on appeal, the supreme court wrote:
[A]ppellate counsel ... has an independent ethical obligation to present both the facts and the applicable law accurately and forthrightly. This will sometimes require appellate counsel to concede error where, although trial counsel obtained a favorable result, either the facts were not as represented to the trial court or the law is clearly contrary to the appellee’s position and no good-faith basis exists to argue that it should be changed.
Id. at 571 (emphasis added).
Appellants have correctly raised at least fifteen reversible errors that are strewn over the trial court’s three orders. Yet, Miller and his counsel have not conceded *41 even a single one. To add flagrant insult to injury, not only has Miller not conceded a single error, but, in almost surreal fashion, has actually filed a motion for sanctions in this court against Dr. Santini and McCoy alleging that all of their “arguments on appeal are completely unsupported by the material facts necessary to establish the defenses asserted and have no support in the law.”
To the contrary, there are a good number of “patently erroneous” errors contained in the lower court’s final orders, at least some of which Miller and his attorney had an ethical duty to concede both below and now before us.
Although the appellants have not specifically requested this relief, we have sua sponte imposed appellate attorney’s fee awards in the past, and we have specially warned that “there is no reluctance whatsoever by this court in approving, or even sua sponte imposing attorney’s fee awards under section 57.105 in appropriate cases.” Brockway v. Town of Golfview, 675 So.2d 699, 700 (Fla. 4th DCA 1996) (emphasis added). Accordingly, we remand this issue to the trial court to properly assess Dr. Santini’s and McCoy’s reasonable attorney’s fees for this appeal and thereafter impose such an award upon Miller. While we are extraordinarily tempted to extend this sanction to Miller’s lawyer, we choose to exercise restraint in that regard and therefore decline to do so.
While this court cannot sanction Miller or his counsel for any actions that occurred in the trial court, on remand the trial court is directed to consider sanctions against Miller and his attorney. See Boca Burger, 912 So.2d at 569. Also, on remand, Dr. Santini and McCoy would be free, after serving Miller with twenty-one-day notice, to file a section 57.105 motion in the trial court. If the trial court were to deny such a motion, this court would be able to review that decision for abuse of discretion.
CONCLUSION
For the reasons stated above, Miller forfeited all of his rights to receive compensation from Dr. Santini. As such, we reverse the final order on Miller’s motion to enforce his charging lien and remand for the trial court to vacate the charging lien altogether. We also reverse the trial court’s awards of sanctions against both McCoy, individually, and Dr. Santini and McCoy jointly. Finally, we sua sponte award appellate attorney’s fees to Dr. San-tini and McCoy. On remand, the trial court shall determine the reasonable amount of these fees.

Reversed and remanded for further proceedings consistent with this opinion.

POLEN, HAZOURI and CIKLIN, JJ., concur.

.The federal court found that Miller’s time records reflected his receipt and review of the undated first notice on February 2, 1998, as did a memorandum in which Miller directed an associate to draft the complaint in Dr. Santini's case. The federal court found that Miller "breached his duty of candor to this tribunal. He deliberately structured his memorandum, affidavits, and witness testimony to create a false impression with the Court.”

. Dr. Santini's case was dismissed by the state (circuit) court in 2001 and an appeal was subsequently taken to this court. We reversed the dismissal and remanded the case to the trial court on May 7, 2003. See Santini v. Cleveland Clinic Fla., 843 So.2d 1029 (Fla. 4th DCA 2003). We also awarded Dr. Santini her appellate attorney’s fees for that appeal.

. The fee sharing agreement entered into between Miller and Senior was never signed or in any way acknowledged by Dr. Santini.

. Prior to the hearings in the charging lien matter, Dr. Santini had already reached an agreement with Senior to pay him $92,350 including costs for his work on the case.

. In announcing its decision to impose sanctions, the trial court stated, "I’m not sure about the other case law on inherent authority. But if that’s true, on both grounds."

. Most of the one-hour hearing was actually spent on Miller's proposed order for an award under the court’s ore tenus ruling sanctioning McCoy at the September 26, 2007 hearing.

. The trial court’s full response was:
All right. I'm going to be succinct. I think for the Fourth District, the terminology that would be the best going forward is res ipsa loquitur.
All I would ask the Fourth District to do on the appeal of this case is to read all the transcripts. Read them. I think it will answer any question that might arise with respect to how this Court came to its rulings.

. Rule 4-1.5(f)(2) of the Rules Regulating The Florida Bar reads in pertinent part:
Every lawyer who ... enters into an agreement ... for compensation for services ... whereby the lawyer's compensation is to be dependent or contingent ... upon the successful prosecution or settlement thereof shall do so only where such fee arrangement is reduced to a written contract, signed by the client, and by a lawyer for the lawyer or for the law firm representing the client. No lawyer or firm may participate in the fee without the consent of the client in writing.

. Miller conceded at trial (and concedes in his answer brief) that he had always represented to Dr. Santini that he was representing her on a contingency fee basis.

. In Chandris, the Florida Supreme Court was asked to answer two certified questions of law from the United States Court of Appeals for the Eleventh Circuit. 668 So.2d at 181. One question was whether a contingency fee agreement entered into in Florida by an out-of-state attorney who resides in Florida but was not licensed to practice law in Florida was void. Id. The second question was if the court determined the first agreement void, whether a subsequent agreement entered into by a Florida law firm based on the void agreement was also void. Id. Thus, to answer the certified questions, it was unnecessary for the Florida Supreme Court to reach a decision regarding whether unrelated violations of the Rules Regulating The Florida Bar would make contingency fee agreements void. As such, the statement could be read as dicta.

.In Lackey v. Bridgestone/Firestone, Inc., 855 So.2d 1186, 1188 (Fla. 3d DCA 2003), the Third District allowed an attorney to recover under a contingency fee contract which contained some provisions that the court found violated the Rules Regulating The Florida Bar. The Third District wrote, “We will not hold that the inclusion of the unenforceable terms voids the entire contract.” Id. Although this is in conflict with a literal reading of the Florida Supreme Court’s statement that any contingency fee agreement which does not comply with the Rules Regulating The Florida Bar is void, the Florida Supreme Court denied review of this decision. Lackey v. Bridgestone/Firestone, Inc., 870 So.2d 822 (Fla.2004); see also Corvette Shop & Supplies, Inc. v. Coggins, 779 So.2d 529, 531 (Fla. 2d DCA 2000) (“While we recognize that strict compliance with the rule is always prudent, we nevertheless conclude that the rule is intended to protect the client ....”) (emphasis added).

. Even if we were to find that a forfeiture of fees was not warranted in this scenario, at best, an attorney who withdraws due to a professional association suspension should be treated no better than an attorney who is discharged for cause. See Scheller, 629 So.2d at 954. In such a case, Miller’s maximum recovery would be $113,150. This is based on a contingency fee of 45% of $457,000 (settlement amount minus costs) less the amount ($92,500) that Dr. Santini had to pay Senior to represent her after Miller’s suspension. Since the original contract was unclear as to whether costs are subtracted first before computing the contingency, the fee should be based on a percentage of net recovery only.

. Although this is by no means a complete list of additional trial court errors, these are some of the most obtrusive.

. Admittedly, in this case Miller was not "discharged without cause.” At the very least, however, the Poletz holding sets the maximum fee that Miller could possibly recover.

. Of course, if the trial court recognized the existence of the contingency fee agreement, the trial court should also have limited Miller’s recovery, even in quantum meruit, to the maximum contract amount. See Rosenberg, 409 So.2d at 1021. We also note that if the trial court were basing the prejudgment interest on the “agreement” of the parties, then interest would not accrue until Dr. Santini actually received the proceeds (sometime after September 26, 2007). See McCarthy, 16 So.3d at 195 (holding that where an agreement between a client and an attorney makes payment contingent on the proceeds of recovery, prejudgment interest is calculated from date the client actually receives the proceeds).

. We note that this was the appropriate forum to file such a motion. See Daniel Mones, PA. v. Smith, 486 So.2d 559, 561 (Fla.1986) *35 ("A summary proceeding in the original action represents the preferred method of enforcing an attorney's charging lien in Florida.").

. Fortunately, we do not have to review whether there is substantial competent evidence to support the trial court’s finding here. We do note, however, that the trial court’s contention of buyer's remorse seems to conflict with the ‘‘twenty-one-day” clause in the written agreement.

. In his motion, McCoy attached an affidavit from Kevin Tynan, an attorney who had worked for twelve years for The Florida Bar on disciplinary issues. Tynan stated, "It is my expert opinion that based upon all of the foregoing that McCoy’s assertion that the settlement was not final was made in good faith, in reliance to known facts that do not appear to be controverted, and with the belief that precedent supported this claim.”

. During a hearing on January 29, 2009, McCoy unequivocally asked the trial court for an evidentiary hearing:
But all I can suggest is, that if fundamental fairness comes into play here and due process, is if Your Honor feels that some sanctions, additional to what you’ve given me already, are warranted and the reasons are apparent to you from Miller’s motion — I don't think they are — I would just ask for the due process of a Show Cause Order or something of that nature so that we can have an evidentiary hearing and I can actually defend myself and my client.
The trial court’s eventual answer to McCoy’s request was:
All right. I’m going to be succinct. I think for the Fourth District, the terminology that would be the best going forward is res ipsa loquitur.
All I would ask the Fourth District to do on the appeal of this case is to read all the transcripts. Read them. I think it will answer any question that might arise with respect to how this Court came to its rulings.